### SPEARS v. COMMONWEALTH.

Court of Appeals of Kentucky.
May 23, 1950.

See also 253 S.W.2d 570.

Davies & Hirschfeld, Newport, George T. Muchlenkamp, Newport, for appellant.

A. E. Funk, Attorney General, Zeb A. Stewart, Asst. Atty. General, for appellee.

HELM, Justice.

Appellant Roosevelt Spears, was indicted for the murder of Charles Edward Thompson. At a trial he was found guilty and his punishment fixed at death. He appeals, assigning as errors: (1) The inexperience of counsel appointed to represent the defendant rendered his appointment so ineffectual that the defendant was deprived of the right secured to him by Section 11 of the Kentucky Constitution to be heard by himself and counsel; (2) the court erred in setting the case for trial only eleven days after counsel was appointed to defend the appellant, in the light of the facts of the case; (3) the court erred in refusing to conduct a voir dire examination of the appearance, conduct, speech, or competency of the witness, Albert Hill, called by the Commonwealth, after the defendant had objected to his testifying because of mental incompetency; (4) the court erred in requiring the witness, Margaret Cottie, to testify and in admitting her testimony over the objection and exception of the appellant, for the reason that the admission of this evidence violated the rule establishing privilege as to communications between husband and wife; and (5) the verdict is palpably against the weight of the evidence.

Appellant and all of the witnesses, except the police and the coroner, are colored people who resided in Newport. The killing occurred on January 24, 1949. For seven years prior to that time appellant lived with Margaret Cottie. They had two children; Patricia, 3, and Bettye Sue, 2. At the time of the killing appellant and Margaret lived at 631 Saratoga Street. The deceased lived with relatives named Poynter at 623 Saratoga Street. Appellant and Margaret had not been getting along, and he divided his time between her and Louise Chapman, by whom he also had one child. It appears that Margaret had "been out" with Willie Thompson of Cincinnati; that he had written her a Christmas card to which appellant objected, and it appears that Margaret had also 'been out with the deceased. Appellant was employed at night as manager of a colored night club. The evidence is undisputed that he habitually carried a gun, which he justified by the nature of his work.

A short time before January 24 the children of appellant and Margaret had had pneumonia. The morning of the shooting appellant came from work to his home and found that Margaret and the children were out. He went to 623 Saratoga Street where he found Margaret and the children. He also saw and spoke to the deceased there. He took the children home. Margaret, with whom he had had some trouble, called the police. The police came to their home. One of them heard appellant accuse Margaret of "being in a room with Thompson down the street," which Margaret denied. The policemen did not arrest appellant but asked him to take a drive with them, which he did. During the drive the policemen noticed a man walking in front of the police car. Appellant told them, "That man, I will kill him. He is the cause of the trouble." The man, it turned out, was the deceased. Later appellant returned to his home and again found that Margaret and the children were away. He went to the Poynter house a second time, went up the stairs to the second floor and knocked at the door. Alfred Hill, a relative of Margaret who lived at appellant's home, opened the door and appellant walked in. In the room at the time were Margaret and her two children; Hill; Sandra Lee Hatchett, 8; Yvonne Poynter, 9; Jimmie Poynter, grandmother of Sandra Lee and Yvonne, and the deceased. The deceased was sitting in a chair.

For the Commonwealth it was shown that without any words having been spoken between appellant and the deceased, and without any demonstration or movement on the part of the deceased toward appellant, appellant pulled a pistol and fired three shots into the body of Thompson, which resulted in his death shortly after the shooting. From the evidence of all those in the room at the time, except appellant, it appears that Thompson was unarmed, and that the shooting was without provocation on the part of deceased.

Appellant testified that on the morning of the 24th when he got home from his work at the 333 Club on Central Avenue Margaret and the children were not at home; that about 11:45 a. m. he "went down to Poynter's" because "Margaret and the kids were there practically every day." He knocked on the door, "Charles said, 'come in.' Him and her were lying across the bed." When appellant went in Charles got off the bed, walked by him and said "Hello." They "had their clothes on." As appellant was leaving the Poynter home he reached down to pick up the children. His pistol fell out of his belt to the floor. Margaret did not leave with him. When they got home one of the children asked to play with the gun. He satisfied her with playing "horse." He had been playing with the children for sometime when Margaret and the officers came in. The officers did not arrest him but he left with them. They put him out at Fourth and Central. He visited a number of clubs. When he returned to his home, Margaret and the children were not there. He went down the street to the Poynter's, the same place he had been that morning; he knocked on the downstairs' door; nobody answered; he went upstairs and knocked on the door; Albert Hill opened it; the children were "standing by Charles Edward's chair playing"; they ran to appellant; appellant "walked halfway in the room"; Patricia said, " 'Look Daddy, gun.' Charles Edward was sitting in a chair He had the gun * * * in front of him right opposite his right leg." Patricia was pointing to Charles Edward when she said. "Look Daddy, gun." Charles Edward was sitting in a chair at the west side of the bed. Appellant was standing at the foot of it. When Patricia spoke appellant was bending over with his hands on the children. He says, "I reached inside of my belt and pulled the pistol"; deceased, Charles Edward, "tried to get up when I straightened up and started to shoot. He tried to get up then. * * * He was holding the gun in one hand. * * * When I first shot * * * he tried to get up and line the gun to me * * * he tried to raise up and get out of the chair. * * * I ran to him * * * I got close to him * * * I shot him until he threw the shotgun on the floor. * : *. * It hit me on the foot * * * I walked down stairs * * * I walked down the

alley and started running. I ran across the railroad tracks and up Sixth Street." He spent the night in Cincinnati. The next day he got in touch with Dan Davies, "the attorney." Mr. Davies went to Cincinnati. Appellant came with Mr. Davies to his office in Newport; got in touch with the officers and surrendered.

■■ The evidence is conflicting. All of the witnesses, except appellant, saying that the deceased was unarmed; that he had no shotgun, and that he made no demonstration of any kind toward appellant. The weight and credibility of the testimony was for the jury. Clearly the evidence was ample to take the case to the jury and to sustain the verdict.

■ Appellant objected to the testimony of Albert Hill on the ground that he was incompetent to testify. It appears that Hill had been confined in some mental institution in Ohio for six years, but that he had been released for three years previous to the time he testified. The trial court, who saw and heard the witness, overruled this objection. A careful reading of the testimony of Hill reveals that he answered questions readily, coherently, and intelligently. The competency of the witness was a question for the court. We are of the opinion that the court did not abuse its discretion in permitting Hill to testify.

Appellant objected to Margaret Cottie testifying on the ground that she was the wife of the defendant. On this question the trial court heard the testimony of Margaret and appellant in chambers, out of the hearing of the jury. She stated that she and appellant had "been living together * * * seven years around the 25th of June." She first started living with appellant on Sixth Street in Newport. They lived together there about four months. They lived together on Second Street in Newport about a "year and a half." A flood got into their house in Newport; they went to Cincinnati until the water went down; they didn't take anything to Cincinnati except their clothes; they were there about a month; when they came back from Cincinnati they went back to the same house they had lived in. The

flood came up twice in one year; they went back to Cincinnati and stayed during the flood; they came back to Newport and later moved to Saratoga Street and have lived there since that time. They did not get married "by buying a license and going through a ceremony."

■ Kentucky does not recognize common law marriage. 13 West Ky. Digest, Marriage, ☞13. The trial court, after hearing the evidence on this question, said: "I believe the evidence is insufficient to establish the relationship of common law marriage." The parties stayed temporarily in Cincinnati on account of flood conditions in Newport. We are not able to say that the holding of the trial court was erroneous. The principal part of Margaret's testimony is as to what happened at the time of the killing. This was competent under the 1940 amendment to Civil Code of Practice, section 606. Mullins v. Commonwealth, 293 Ky. 572, 169 S.W.2d 611.

■ Appellant being unable to employ counsel, the court, on March 10, 1949, appointed Mr. George Muehlenkamp of the Newport Bar to defend him. It is said that he had been admitted to practice for only about one year. However, at the time of the trial he was, it appears, more than 32 years of age, a man of maturity. A study of the record convinces us that for one admitted so recently he possesses unusual knowledge of criminal law and procedure. As the Attorney General points out in his brief, he represented his indigent client with unusual skill and ability. Our laws do not prescribe the experience or qualification an attorney should have for representing any defendant.

■ It is said that counsel for appellant had a short time for preparation. When the case was finally called for trial he did not ask for further time. There was no suggestion then, and there is none now, that any additional witnesses could have been obtained to support appellant's defense. The record, from the examination and cross-examination of witnesses by appellant's counsel, shows that he was fully familiar with the facts of the case. The Commonwealth urges that: "The

**570**

trouble seems to be that appellant was abundantly and conclusively proven guilty by competent and relevant evidence and beyond any question of doubt, and it is our opinion that the outcome of the trial would have been the same had appellant been defended by the ablest criminal lawyers in this Commonwealth."

The jury saw and heard appellant and all of the witnesses. The verdict of the jury shows that the jury believed the witnesses for the Commonwealth. The testimony of those witnesses is that appellant shot and killed the deceased at a time when he was sitting in a chair unarmed, and not doing or saying anything to appellant. We have made a careful study of the whole record. The record does not reveal any errors substantially prejudicial to appellant's rights.

The judgment is affirmed.